**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **COWBOY IP, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:25-cv-3598** |
| | § | |
| **LUCIA F. MACIAS, WALTER ARREDONDO, AND COWBOY CHICKEN PERUVIAN CUISINE, LLC,** | § | |
| | § | |
| **Defendants.** | § | |

**MEMORANDUM AND RECOMMENDATION**[1]

Pending before the Court is Plaintiff Cowboy IP, LLC's ("Plaintiff") Motion for Default Judgment against Defendant Cowboy Chicken Peruvian Cuisine, LLC ("LLC Defendant").[2] (ECF No. 37). Based on a review of the motion, the record, and the relevant law, the Court **RECOMMENDS GRANTING IN PART AND DENYING IN PART** Plaintiff's motion (*id.*).

---

[1] This case was referred to the Undersigned for all purposes pursuant to 28 U.S.C. § 636(b)(1)(A) and (B) and Federal Rule of Civil Procedure 72. (ECF No. 15).

[2] On December 12, 2025, Defendants filed a notice that Cowboy Chicken Peruvian Cuisine has since been rebranded to "Antara Chicken Peruvian Cuisine." (ECF No. 26). Although the Court takes notice of this rebranding, the Court will refer to the LLC Defendant as Cowboy Chicken Peruvian Cuisine at all relevant times for the purposes of this Memorandum and Recommendation.

## I. Background

### A. Factual Background[3]

This is a trademark dispute involving chicken cuisine and restaurants. Since the 1980s, Plaintiff has owned several "Cowboy Chicken" trademarks for restaurants and catering services. (ECF No. 1 at 4). Plaintiff's "Cowboy Chicken" restaurants "have grown from the original location in Dallas, Texas, in 1981, to approximately 19 locations." (*Id.*). Plaintiff's restaurant and catering services are also available to consumers online at www.cowboychicken.com. (*Id.*). As their culinary forte, the restaurants offer "wood-fired food, particularly chicken that is slow roasted in a wood-fired oven." (*Id.*). For their business, Plaintiff owns and uses federally registered trademarks that are tied to its "advertisement and sale of food through its Cowboy Chicken restaurant and catering services"—collectively, the "Cowboy Chicken Trademarks." (*Id.*). These trademarks include two "Cowboy Chicken" word marks (the "Cowboy Word Marks"); one Cowboy Chicken special form mark designed as a chicken character in a cowboy hat and boots, along with a downward lasso that spells out "Cowboy Chicken" (the "Cowboy Chicken Character Mark"); and four Cowboy Chicken special form marks designed as the outline of a chicken over woodfire logs with the words "cowboy chicken" and

[3] The following facts are taken from Plaintiff's Complaint (ECF No. 1).

"wood fire rotisserie" in various styles and sizes (the "Woodfire Rotisserie Chicken Marks").[4] (*Id.* at 5–6).

| Trademark | Registration No. |
| --- | --- |
| COWBOY CHICKEN | 3,338,009 |
| COWBOY CHICKEN | 5,531,231 |
| Cowboy Chicken | 1,620,524 |

[4] U.S. Trademark Reg. No. 3,338,009 (registered Nov. 11, 2007); U.S. Trademark Reg. No. 5,531,231 (registered June 31, 2018); U.S. Trademark Reg. No. 1,620,524 (registered Oct. 30, 1990); U.S. Trademark Reg. No. 5,566,641 (registered Sep. 9, 2018); U.S. Trademark Reg. No. 5,531,230 (registered June 31, 2018); U.S. Trademark Reg. No. 5,656,532 (registered Jan. 15, 2019); U.S. Trademark Reg. No. 5,532,017 (registered Jan. 31, 2018). (ECF No. 1 at 4–6).

| | |
|---|---|
| EST 1981 COWBOY CHICKEN WOOD FIRE ROTISSERIE | 5,566,641 |
| COWBOY CHICKEN WOOD FIRE ROTISSERIE | 5,531,230 |
| COWBOY CHICKEN WOOD FIRE ROTISSERIE | 5,656,532 |
| COWBOY CHICKEN WOOD FIRE ROTISSERIE | 5,532,017 |

Defendants Cowboy Chicken Peruvian Cuisine, LLC, Lucia Macias, and Walter Arredondo (collectively, "Defendants") are also in the restaurant industry and own and operate a restaurant in Houston, Texas called "Cowboy

Chicken Peruvian Cuisine."[5] (*Id.* at 8). Like Plaintiff, Defendants use and reference "Cowboy Chicken" in connection with their restaurant services and rotisserie chicken offerings. (*Id.* at 9). Defendants have marketed and advertised "Cowboy Chicken Peruvian Cuisine" at their establishment, online via Facebook and Instagram, and through delivery services, such as Door Dash. (*Id.* at 9–10). Defendants also have used a chicken character dressed in a cowboy hat and boots, along with an upward lasso around the words "Cowboy Chicken Peruvian Cuisine" ("Defendants' Chicken Character"):







(*Id.* at 8, 10).

After Plaintiff learned of Defendants' business in January 2025, it sent Defendants a cease-and-desist letter on January 30, 2025, advising them of its Cowboy Chicken Trademarks and Defendants' purported infringing use of the marks. (*Id.* at 11). In February 2025, Ms. Macias responded that "they were

[5] Per the Complaint, "Lucia F. Macias is the Managing Member" and "Walter Arredondo is the chef and owner" of Cowboy Chicken Peruvian Cuisine. (ECF No. 1 at 2).

not aware their use was infringing and [sought] guidance as to how to remedy the situation." (*Id.*). On April 22, 2025, Plaintiff's counsel wrote to Defendants offering "an extended period of time to transition away from infringing use and to adopt non-infringing use on all signage, menus, paper goods, marketing materials, online presence, branded merchandise and uniforms, and their business name and domain name." (*Id.*). On May 14, 2025, Defendants responded and denied any infringement. (*Id.*).[6]

### B. Procedural Background

On August 4, 2025, Plaintiff filed a Complaint against Defendants for Trademark Infringement and Unfair Competition under the Lanham Act, in violation of 15 U.S.C. §§ 1114, 1125(A), and for common law Trademark Infringement, Unfair Competition, and Unjust Enrichment under Texas Law. (ECF No. 1 at 14–19). Plaintiff alleges "Defendants have engaged in a deliberate attempt to capitalize on [Plaintiff's] goodwill by infringing on the Cowboy Chicken Trademarks online, in advertising, and as used directly in connection with Defendants' similar and competing services within the restaurant industry." (*Id.* at 11). Plaintiff alleges Defendants do not have permission from Plaintiff to use the Cowboy Chicken Trademarks in

[6] Plaintiff submits that the early 2025 letters and related correspondence are attached as exhibits to the Complaint (ECF No. 1 at 11); however, there are no attachments to the Complaint. In any event, the parties' communications during this time period are not material to the issues discussed below.

connection with their restaurant services, including online on social media or in person at its physical location in Texas, where Plaintiff is also located. (*Id.* at 12). Plaintiff further alleges Defendants have participated in an ongoing and willful pattern of infringement despite notice from Plaintiff. (*Id.*). At the time of the filing of the Complaint, Defendants allegedly have continued to use the Cowboy Chicken Trademarks or similar derivatives and have "publicly announced their expansion into a second restaurant."[7] (*Id.*). According to Plaintiff, Defendants' acts "are intended to cause, have caused, and/or are likely to continue to cause confusion or mistake, or to deceive consumers, the public, and the trade into believing that Defendants' restaurant services . . . originate or are affiliated with [Plaintiff]" and its restaurant services. (*Id.* at 13). For relief, Plaintiff seeks, inter alia, a permanent injunction, costs, attorneys' fees, and accounting of profits. (*Id.* at 20–21).

Plaintiff served the LLC Defendant on August 7, 2025 (ECF No. 12) and served Mr. Arredondo and Ms. Macias on August 5 and 7, respectively (ECF Nos. 10–11). On August 11, 2025, the individual Defendants submitted a *pro se* filing as their Answer, which states, "[w]e deny any intentional wrongdoing

[7] Plaintiff supports this allegation with an Instagram link to a post of a third-party cleaning business, dated May 13, 2025, sharing Walter Arredondo/Cowboy Chicken Peruvian as a client and captioning "Walter is expanding his restaurant and opening a second location[.]" (ECF No. 1 at 11). There is no other evidence that Defendants have in fact opened a second location under the name Cowboy Chicken Peruvian.

or willful infringement. We are a small family-operated restaurant with no legal knowledge or financial ability to afford legal counsel. We are currently in the process of changing the name of our restaurant in order to avoid any future confusion or conflict." (ECF No. 9 at 1). Attached to the filing, is a letter from Ms. Macias, dated May 12, 2025 and addressed to Robert H. Johnston of Johnston & Associates PLLC, stating "we recently received a notice concerning the use of the name 'Cowboy Chicken,' and we would like to express our sincere intention to engage in respectful and good-faith dialogue to clarify the situation."[8] (*Id.* at 9-1 at 4). Ms. Macias further states "[t]he name was originally approved and legally registered by the State of Texas. We were unaware of the existence of the federally registered trademark. Once we were notified, we acted promptly and changed our legal business name to Cowboy Chicken Peruvian Cuisine LLC to . . . avoid any possible confusion."[9] (*Id.*). Ms. Macias adds that "[w]e are not in direct competition, as we serve only traditional Peruvian food. We do not use your logo, brand design, or color scheme. We have no intention of benefiting from or creating confusion with

---

[8] Robert H. Johnston is the attorney of record for the Cowboy Chicken Trademarks' federal registrations. *See supra* note 4.

[9] The filing also attaches corresponding certificates from the Texas Secretary of State indicating Defendants' LLC was changed from "Cowboy Chicken LLC" to "Cowboy Chicken Peruvian Cuisine LLC" in April 2025. (ECF No. 9-1 at 1–3).

your trademark. To our knowledge, your company does not currently operate in the Houston area." (*Id.*).

On August 22, 2025, Plaintiff's counsel sent Defendants a letter, advising them that the Answer was deficient under the Federal Rules of Civil Procedure, the LLC Defendant was required to be represented by counsel, and the Defendants had to each file proper Answers or risk a default judgment being entered against them. (ECF No. 14-1 at 5–7).

On October 3, 2025, pursuant to Federal Rule of Civil Procedure ("Rule") 55, Plaintiff filed a Request for Entry of Default against the LLC Defendant due to its failure to respond through counsel. (ECF No. 14). About a week later, the individual Defendants filed a letter to the Court, stating:

> The restaurant previously operated under the name "Cowboy Chicken Peruvian Cuisine," but as of August 2025 we have completely changed our business name to "Antara Chicken." We have already replaced our signage, menus, business cards, and online presence to reflect the new name, and we have no intention of ever using the disputed name again. We wish to demonstrate to the Court that we have acted in good faith to resolve any concerns related to trademark use.

(ECF No. 18). The letter also includes certificates from the Texas Secretary of State indicating Defendants' LLC was changed from "Cowboy Chicken Peruvian Cuisine LLC" to "Antara Chicken Peruvian Cuisine LLC" in September 2025. (*Id.* at 2–5).

On December 8, 2025, the individual Defendants filed a "Notice of Full Rebranding and Request for Spanish Interpreter [at the Initial Conference]." (ECF No. 24). As to rebranding, Mr. Arredondo advised the Court they had stopped using the "Cowboy Chicken Peruvian Cuisine" name, switched to "Antara Chicken Peruvian Cuisine," and changed (1) the legal business name, (2) exterior signs, (3) social media, (4) online listings (Google, Facebook, TikTok, Instagram), (5) business cards, and (6) public advertisements. (*Id.* at 1). Mr. Arredondo contended "[t]he only item still being updated is the printed menu[.] (*Id.*). He also informed the Court that Defendants "are unable to afford legal counsel and therefore appear pro se." (*Id.*). The Court denied the appointment of an interpreter due to the lack of authority to do so in civil cases and given the sufficiency of the parties' filings in English. (ECF No. 25).

On December 12, 2025, the individual Defendants filed another notice, again advising the Court that they had rebranded their business to Antara Chicken Peruvian Cuisine and had changed the aforementioned list of items. (ECF No. 26). They also stated in part:

> We have never intended to infringe on the plaintiff's trademark, nor did we ever gain any benefit from the disputed name. . . . we have responded to every letter sent by the plaintiff's attorney. . . . we respectfully request that the Court consider allowing this matter to be resolved without costs or damages . . . We remain willing to sign any written agreement confirming that we will never use the disputed name again.

(*Id.* at 2).[10] Defendants did not appear at initial conference on January 5, 2026.

Turning to Plaintiff's request for entry of default, the Court granted the request on January 7, 2026, finding that Plaintiff demonstrated proper service of the Complaint on the LLC Defendant, no counsel had appeared on behalf of the LLC Defendant, and the individual Defendants were not licensed to practice law in Texas and therefore could not represent the LLC Defendant. (ECF No. 29). The Court further found the LLC Defendant had not filed an Answer or otherwise responded to the Complaint. (*Id.*). Accordingly, the Court ordered the Clerk of Court to enter default against the LLC Defendant pursuant to Rule 55(a). (*Id.*). The Clerk entered default on January 28, 2026. (ECF No. 35).[11]

On March 18, 2026, Plaintiff filed the instant Motion for Default Judgment against the LLC Defendant. (ECF No. 37). In the motion, Plaintiff reasserts its claims and allegations regarding its rights in the Cowboy Chicken Trademarks and Defendants' alleged infringement. (*Id.* at 4–6). Plaintiff acknowledges Defendants' rebranding, but notes Defendants "have not ceased

[10] The Defendants also attached two letters purportedly sent to Plaintiff's counsel in October and December 2025 conveying their business's rebranding to Antara Chicken Peruvian Cuisine. (ECF No. 26 at 4–5).

[11] The Clerk initially entered default on January 7, 2026 pursuant to Rule 68 due to a clerical error. (ECF No. 30). On January 23, Defendants moved for clarification (ECF No. 33), and on January 28, the Court granted the motion and ordered the clerk to re-enter default pursuant to Rule 55(a) (ECF No 36).

use of all of the [marks,]" as "[t]here remains residual unauthorized use of Plaintiff's Cowboy Marks on multiple websites—including Wheree, Uber Eats, Postmates, DoorDash, Yelp, and MapQuest." (*Id.* at 6). Additionally, although Defendants have changed their business name, Plaintiff contends Defendants "continue to use a graphic of a chicken dressed in western attire swinging a lasso, which is confusingly similar derivative of one or more of Plaintiff's Cowboy Marks." (*Id.* at 6–7). For support, Plaintiff points to exhibits in its discovery and case management plan filed in October 2025 (ECF No. 22 at 29–52).




(*Id.* at 48–52 ("Defendants' Antara Chicken Character")). Plaintiff also emphasizes Defendants' lack of participation and conference during the litigation, particularly leading up to, and at, the initial conference, where Defendants failed to appear. (ECF No. 37 at 7–9). In addition to default judgment against the LLC Defendant, Plaintiff requests for relief: (1) a

permanent injunction enjoining the LLC Defendants from using Plaintiff's Cowboy Chicken Trademarks; (2) costs; (3) attorneys' fees; and (4) an accounting of profits and expenses. (*Id.* at 19–27).

## II. Legal Standard

### A. Federal Rule of Civil Procedure 55

Rule 55 sets forth the requirements for obtaining a default judgment. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." FED. R. CIV. P. 55(a). If the plaintiff's claim is not for a sum certain or a sum that can be made certain by computation, "the party must apply to the court for a default judgment." FED. R. CIV. P. 55(b). *See also New York Life Ins. Co. v. Brown*, 84 F.3d 137, 141 (5th Cir. 1996) ("An *entry of default* is what the clerk enters when the default is established by affidavit or otherwise. . . . After defendant's default has been entered, plaintiff may apply for a judgment based on such default. This is a *default judgment*.") (emphasis in original). "When an action presents more than one claim for relief . . . or when multiple parties are involved, the court may direct entry of a final judgment as to one or more, but fewer than all, claims or parties only if the court expressly determines that there is no just reason for delay." FED. R. CIV. P. 54(b).

"District courts are afforded wide discretion in determining whether to enter a default judgment." *Asazu L.L.C. v. Collectandcreate LLC*, No. 3:23-cv-1285, 2023 WL 8244046, at *1 (N.D. Tex. Nov. 28, 2023) (determining whether to enter a default judgment in a trademark case involving restaurants serving Japanese cuisine and sushi). "Default judgments are a drastic remedy, not favored by the Federal Rules and resorted to by courts only in extreme situations." *Sun Bank of Ocala v. Pelican Homestead and Sav. Ass'n*, 874 F.2d 274, 276 (5th Cir. 1989). "Courts must carefully review the pleadings to ensure that a plaintiff is entitled to a default judgment." *Asazu L.L.C.*, 2023 WL 8244046, at *1. "'A default judgment is unassailable on the merits but only so far as it is supported by well-pleaded allegations, assumed to be true.'" *Wooten v. McDonald Transit Assocs., Inc.*, 788 F.3d 490, 496, 498 (5th Cir. 2015) (citing *Nishimatsu Constr. Co. v. Hous. Nat. Ban*k, 515 F.2d 1200, 1206 (5th Cir. 1975) and employing the same analysis used to determine sufficiency under Rule 8). "[A] a defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered." *Nishimatsu Constr. Co.*, 515 F.2d at 1206. "The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law. In short . . . a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Id.* "Any doubt

as to whether to enter or set aside a default judgment must be resolved *in favor of the defaulting party*." *John Perez Graphics & Design, LLC v. Green Tree Inv. Grp., Inc.*, No. 3:12-cv-4194, 2013 WL 1828671, at *3 (N.D. Tex. May 1, 2013) (emphasis added).

"In considering Plaintiff's motion, the Court must determine: (1) whether default judgment is procedurally warranted, (2) whether Plaintiff's complaint sets forth facts sufficient to establish that it is entitled to relief, and (3) what form of relief, if any, Plaintiff should receive." *Mancillas v. De Casimiro*, No. 1:23-cv-1563, 2025 WL 624548, at *2 (W.D. Tex. Feb. 18, 2025) (following the same framework in a musician's trademark dispute against a former band member for using his marks) (citations omitted).

**B. Trademark Law with Default Judgment**

"Although courts have power to issue injunctions sought in motions for default judgment, the plaintiff must still demonstrate it is entitled to such relief." *Asazu L.L.C.*, 2023 WL 8244046, at *2. The Lanham Trademark Act grants courts the power to issue injunctions, "according to the principles of equity and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a). As a leading trademark treatise states:

> Even if defendant does not appear and defaults, on plaintiff's motion for a default judgment, the court has the right to determine if the well-pleaded facts in the complaint establish defendant's liability. If in a trademark infringement claim, it is determined

> that the facts do not allege a plausible case of likelihood of confusion, the court can dismiss the case. After entry of a default, the trademark owner must prove it is entitled to the legal and equitable remedies sought in its complaint against each defendant.

5 McCarthy on Trademarks and Unfair Competition § 32:121.90 (5th ed. 2026) (explaining default judgment in trademark cases).

## III. Discussion

### A. Default Judgment is Procedurally Warranted

The Fifth Circuit sets out several factors to consider when determining whether default judgment is procedurally warranted: (1) whether material issues of fact are at issue, (2) whether there has been substantial prejudice, (3) whether the grounds for default are clearly established, (4) whether the default was caused by a good faith mistake or excusable neglect, (5) the harshness of a default judgment, and (6) whether the court would think itself obliged to set aside the default on the defendant's motion. *Lindsey v. Prive Corp.*, 161 F.3d 886, 893 (5th Cir. 1998). Reviewing Plaintiff's Motion against the *Lindsey* factors, the Court finds that a default judgment is procedurally warranted.

First, there are no material facts in dispute because, by the very fact of its default, the LLC Defendant "admits the plaintiff's well-pleaded allegations of fact." *Nishimatsu Constr. Co.*, 515 F.2d at 1206. Second, the LLC Defendant's "failure to respond threatens to bring the adversary process to a halt, effectively prejudicing [Plaintiff's] interests." *See Asazu L.L.C.*, 2023 WL

8244046, at *2. Third, the grounds for default are clearly established given the LLC Defendant's failure to respond—through counsel—to Plaintiff's Complaint or Motion since August 2025 or March 2026, respectively. *See United States v. Washington*, No. 3:17-cv-0846, 2017 WL 3394730, at *1–2 (N.D. Tex. Aug. 8, 2017) (finding grounds for default clearly established for failure to respond for two months). Fourth, there is no evidence before the Court indicating that the LLC Defendant's failure to respond is the result of a "good faith mistake or excusable neglect."[12] *See Asazu L.L.C.,* 2023 WL

---

[12] As has been made clear (*see* ECF Nos. 29, 34), "a corporation cannot appear in federal court unless represented by a licensed attorney." *Memon v. Allied Domecq QSR*, 385 F.3d 871, 873 (5th Cir. 2004). "[T]he corporation must acquire a licensed attorney to represent it in court. When a corporation declines to hire counsel to represent it, the court may strike its defenses if it is a defendant." *BTL Indus., Inc. v. Advanced Med. Inc.*, No. 1:25-cv-907, 2025 WL 4114899, at *2 (W.D. Tex. Aug. 8, 2025) (citations omitted); *see also Donovan v. Rd. Rangers Country Junction, Inc.*, 736 F.2d 1004, 1005 (5th Cir. 1984) (noting that the district court properly struck the defenses of a corporate defendant where the sole shareholder refused to hire counsel to represent the corporation). Corporations therefore risk facing default for failure to hire counsel to represent it. *BTL Indus., Inc.*, 2025 WL 4114899, at *2. However, "the appropriate measure for a judge to take when confronted with an unrepresented corporation is inherently discretionary." *Memon*, 385 F.3d at 873 ("[T]he judge might, inter alia, admonish the corporation that it cannot proceed without counsel, order the corporation to retain counsel within a certain period of time (the appropriate amount of time also being within the judge's discretion) . . . ."). Here, Plaintiff's counsel sent Defendants a letter in August 2025 advising them that the LLC was required to be represented by counsel (ECF No. 14-1 at 5–7), and this Court's January 7 and 28 Orders noted a corporation cannot appear in federal court unless represented by counsel (*see* ECF Nos. 29, 34). Defendants acknowledged as much in their filings with the Court, but noted they lack financial resources to retain counsel (*see, e.g.*, ECF No. 24). While the Court is considerate of Defendants' financial inability to retain counsel, such a reason does not constitute a good faith mistake or excusable neglect in failing to respond. *See F.M.D. Holdings, LLC v. Regent Fin. Corp.*, No. 5:20-cv-269, 2021 WL 5883136, at *16 (N.D. Tex. Dec. 10, 2021) (finding that a *pro se* corporate defendant's inability or refusal to retain counsel, including claimed financial inability, did not constitute excusable neglect).

8244046, at *2; *United States v. Padron,* No. 7:17-cv-00009, 2017 WL 2060308, at *3 (S.D. Tex. May 12, 2017), *judgment entered*, No. 7:17-cv-00009, 2017 WL 2537033 (S.D. Tex. May 12, 2017) (finding no indication that corporation's default was caused by a good faith mistake or excusable neglect, where corporation's sole shareholder simply elected not to provide the corporation with counsel, thus rendering inevitable its failure to answer and appear). Fifth, Plaintiff seeks injunctive relief after a significant amount of time has passed without a response from the LLC Defendant, which "mitigat[es] the harshness of a default judgment." *John Perez Graphics & Design, LLC*, 2013 WL 1828671, at *3. Finally, the Court is not aware of any facts that would give rise to good cause to set aside the default if challenged by the LLC Defendant. *See Asazu L.L.C.,* 2023 WL 8244046, at *2; *Lindsey*, 161 F.3d at 893. *But cf. BTL Indus., Inc. v. Adv. Med. Inc.*, No. 25-cv-907, 2026 WL 951845, at *3 (W.D. Tex. Mar. 23, 2026), *report and recommendation adopted*, No. 1:25-cv-907, 2026 WL 1169274 (W.D. Tex. Apr. 28, 2026) (recommending denial without prejudice of default judgment against corporate defendant where claims against individual defendants remained pending, because the allegations were pleaded collectively and entry of default would prejudice the remaining

individual defendants).[13] Thus, Plaintiff has met the procedural requirements for a default judgment.

**B. The Basis for Judgment on the Pleadings**

Next, Plaintiff must show it is entitled to judgment based on its pleadings. Plaintiff asserts claims for Trademark Infringement and Unfair Competition under the Lanham Act and for common law Trademark Infringement, Unfair Competition, and Unjust Enrichment under Texas state law. (ECF No. 1 at 14–19). The Court first will address trademark infringement and unfair competition, and then unjust enrichment.[14]

---

[13] The Court perceives that the procedural posture of this case presents a potential issue under *Frow v. De La Vega*, 82 U.S. 552 (1872) and its progeny. "Inconsistent default judgments, like inconsistent judgments more generally, are strongly disfavored. When a case involves multiple defendants, courts may not grant default judgment against one defendant if doing so would conflict with the position taken by another defendant." *Escalante v. Lidge*, 34 F.4th 486, 495 (5th Cir. 2022) (stating that principle traces back to *Frow*); *see Holland v. CryptoZoo Inc.*, No. 1:23-cv-00110, 2025 WL 2492965, at *2 (W.D. Tex. July 22, 2025), *report and recommendation adopted*, No. 1:23-cv-00110, 2025 WL 2998599 (W.D. Tex. Oct. 23, 2025) ("[B]ased on *Frow*, courts should refrain from granting default judgment as to the defaulting defendant when claims as to the answering, co-defendants are pending."). Although that principle does not necessarily preclude entering default judgment against the LLC Defendant, because its failure to appear and defend is itself the basis for the default, and it is more of a procedural consequence than a merits adjudication, the Court addresses the issue below. *See infra* Part III.C.1.

[14] Although Defendants apparently rebranded their restaurant, Plaintiff's claims are not moot. *See Energy Alchemy, Inc. v. Nambo*, No. 3:23-cv-00815, 2025 WL 2625586, at *1 (N.D. Tex. Sep. 10, 2025) ("Although Defendants apparently changed their restaurant's primary physical signage and website months after this lawsuit was filed, Plaintiff's claims are not moot."); *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 198 (5th Cir. 1998) ("The cessation of infringing activity does not affect the determination of liability, but it may make an injunction unnecessary. . . . Ceasing the infringing activity does not allow an infringing party to escape liability."). This is particularly true considering that, according to Plaintiff, there remains residual use of Plaintiff's marks online and Defendants continue to use a graphic of a chicken dressed in western attire that is confusingly similar to Plaintiff's Cowboy

1. Trademark Infringement and Unfair Competition

The Lanham Act and common law claims for trademark infringement and unfair competition "require a plaintiff to establish (1) ownership of a legally protectable mark and (2) a likelihood of confusion resulting from defendant's use of the mark." *See Asazu L.L.C.*, 2023 WL 8244046, at *2 (citing *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017) ("The elements of common law trademark infringement under Texas law are the same as those under the Lanham Act.")); *Elvis Presley Enters., Inc.*, 141 F.3d at 193 ("A determination of a likelihood of confusion under federal law is the same as the determination of a likelihood of confusion under Texas law for a trademark infringement claim."); *Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 538 (S.D. Tex. 2013) (finding "the Court must only conduct one inquiry to determine [the defendants'] liability," where the facts that supported trademark infringement under the Lanham Act also supported trademark infringement and unfair competition under Texas common law); *see also Organicare Nature's Sci., LLC v. Cheng*, No. 1:25-cv-343, 2025 WL 2629970, at *4 n.3 (W.D. Tex. Aug. 22, 2025), *report and recommendation adopted*, No.

---

Chicken Character Mark. (ECF No. 37 at 6). *See also* 4 McCarthy on Trademarks and Unfair Competition § 30:11 (5th ed. 2026) ("If there is a substantial possibility that the infringing acts may be repeated, the matter is not moot. The reform of the defendant must be irrefutably demonstrated and total. . . .Voluntary cessation of infringing activity does not routinely make a preliminary injunction unnecessary.").

1:25-cv-343, 2025 WL 2628120 (W.D. Tex. Sep. 11, 2025) (reciting elements for unfair competition under the Lanham Act and analyzing federal and state-law unfair-competition claims together because "[u]nfair competition claims under Texas law are analyzed under the same standard as claims under the Lanham Act"). "To be protectable, a mark must be distinctive, either inherently or by achieving secondary meaning in the mind of the public." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008). Secondary meaning "occurs when, in the minds of the public, the primary significance of a [mark] is to identify the source of the product rather than the product itself." *Id.* at 331.

As to the first element, Plaintiff has established ownership of a legally protectable trademark by providing proof of the Cowboy Chicken Trademarks' registrations. (ECF Nos. 1, 3). "[P]roof of the registration of a mark with the [Patent and Trademark Office] constitutes prima facie evidence that the mark is valid and that the registrant has the exclusive right to use the registered mark in commerce with respect to the specified goods or services." *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 237 (5th Cir. 2010) (citing, inter alia, 15 U.S.C. § 1115(a)); *see also Streamline Prod. Sys., Inc.*, 851 F.3d at 451 ("Registration of a mark with the PTO is 'prima facie evidence that the mark[ ] [is] inherently distinctive.'" (citing *Am. Rice, Inc.*, 518 F.3d at 329)).

For the second element, however, Plaintiff must show that the LLC Defendant's use of the disputed marks "created a likelihood of confusion in the minds of potential consumers as to the source, affiliation, or sponsorship" of the LLC Defendant's products or services. *Asazu L.L.C.*, 2023 WL 8244046, at *3 (citation omitted). "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Elvis Presley Enters., Inc.*, 141 F.3d at 193; *see also* 3 McCarthy on Trademarks and Unfair Competition § 23:3 (5th ed. 2026) ("Likelihood of confusion is synonymous with 'probable' confusion—it is not sufficient if confusion is merely 'possible.'"). The Fifth Circuit uses the following factors in determining whether a likelihood of confusion exists: (1) strength of the plaintiff's mark; (2) similarity of design between the marks; (3) similarity of the products; (4) identity of retail outlets and purchasers; (5) similarity of advertising media used; (6) the defendant's intent; (7) actual confusion; and (8) degree of care exercised by potential purchasers. *Am. Rice, Inc.*, 518 F.3d at 329; *see also Viacom Int'l v. IJR Cap. Invs., L.L.C.*, 891 F.3d 178, 192 (5th Cir. 2018) (explaining that "[t]o assess whether use of a mark creates a likelihood of confusion as to affiliation, sponsorship, or source," the Fifth Circuit considers the so-called "digits of confusion" that includes eight factors). "The likelihood of confusion factors are non-exhaustive, fact-specific, and flexible." *Asazu*

*L.L.C.*, 2023 WL 8244046, at *3. "However, the Court cannot grant the extraordinary relief of a default judgment when it does not possess sufficient facts to conclude there is a likelihood of confusion from Defendant's actions." *Id.* (citing *Jim S. Adler, P.C. v. McNeil Consultants, L.L.C.*, 10 F.4th 422, 427 (5th Cir. 2021)). "Likelihood of confusion is a question of fact." *Viacom Int'l*, 891 F.3d at 192. Because all of Plaintiff's marks present different elements, the Court shall divide them up in three ways based on their features: the Cowboy Word Marks, the Cowboy Chicken Character Mark, and the Woodfire Rotisserie Chicken Marks. The Court addresses each likelihood of confusion factor in turn.

a. Strength of the Mark

Strength of a trademark is determined by two factors: "A trademark's strength is determined by the classification of the mark and the mark's standing in the marketplace." *Asazu LLC*, 2023 WL 8244046, at *3. For the first factor, marks may be classified as "generic, descriptive, suggestive, or arbitrary and fanciful." *Am. Rice, Inc.*, 518 F.3d 321, 330. "The strength and therefore the protection of a mark in the marketplace increases 'as one moves away from generic and descriptive marks toward arbitrary marks.'" *Asazu LLC*, 2023 WL 8244046, at *3. The suggestive, arbitrary, and fanciful categories are inherently distinctive, whereas generic marks cannot be

distinctive, and "descriptive marks are distinctive only if they have acquired 'secondary meaning.'" *Streamline Prod. Sys., Inc.*, 851 F.3d at 451. "A descriptive term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Id.* A suggestive term "'suggests, rather than describes,' some characteristic of the goods to which it . . . applie[s] and requires the consumer to exercise his imagination to reach a conclusion as to the nature of those goods." *Id.* (citation omitted). "If a word requires imagination to apply it to the product or service in question, it tends to show that the term as used is suggestive. On the other hand, if the word conveys information about the product, it is descriptive." *Id.* at 452. "Arbitrary marks have no relation to the product or service with which they are used." *Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, 397 F. Supp. 3d 847, 860 (N.D. Tex. 2019).

In categorizing a mark, we "examine the context in which it is used," including "'how [the term] is used with other words,' 'the products or services to which it is applied,' and 'the audience to which the relevant product or service is directed.'" *Streamline Prod. Sys., Inc.*, 851 F.3d at 451 (citation modified) (analyzing infringement between plaintiff's mark "Streamline Production Systems" and defendant's use of "Streamline Manufacturing"). When evaluating a multi-word mark, "we consider the mark 'as a unitary

whole in its given arrangement, and do not parse apart the constituent terms.'" *Id.*

Under the Lanham Act, a registered mark that has been and is still in continuous use in commerce for five consecutive years after the date of such registration is "incontestable." 15 U.S.C. § 1065. To the extent that the right to use the registered mark has become incontestable under § 1065, "the registration shall be conclusive evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1115(b).

The second factor—a mark's standing—goes to marketplace recognition, and "depends on advertising, length of time in business, public recognition, and uniqueness." *Asazu LLC*, 2023 WL 8244046, at *3 (citing *RE/MAX Int'l, Inc. v. Trendsetter Realty, LLC*, 655 F. Supp. 2d 679, 698–99 (S.D. Tex. 2009)).

Here, the Cowboy Word Marks and the Cowboy Chicken Character Mark are inherently distinctive because they are neither generic nor descriptive. The Cowboy Word Marks and the Cowboy Chicken Character Mark are not descriptive because they do not describe or identify "a characteristic or quality of [Plaintiff's] service," such as the nature or quality of its restaurant or cuisine. *Streamline Prod. Sys., Inc.*, 851 F.3d at 451–52 ("'Thus, in many cases,

a descriptive term will be an adjective such as 'speedy,' 'friendly,' 'green,' 'menthol,' or 'reliable.'") (citation omitted). Indeed, neither "Cowboy Chicken" nor the Cowboy Chicken Character describe Plaintiff's services or reference what type of cuisine is offered by its restaurant services. These marks are *at least* "suggestive" because they "'suggest[], rather than describe[],' some characteristic of the goods to which it . . . applie[s]." *Id.* at 452 ("Examples of suggestive terms include 'Penguin' for a refrigerator brand, . . . and 'Coppertone' for sun tanning products"). In this case, these marks "require[] the consumer to exercise his imagination to reach a conclusion as to the nature of those goods"—that the chicken offered by Plaintiff consists of some southern (cowboy) variant. *Id.* *See also Firebirds Int'l, LLC*, 397 F. Supp. 3d 847, 861 (N.D. Tex. 2019) (finding Plaintiff's registered "Firebirds" mark for its restaurant services was not generic or descriptive because "Firebirds is clearly not generic when used as a mark for a restaurant (e.g., 'Steakhouse'). Nor is it descriptive. A descriptive term provides an attribute or quality of a good. While 'Fire' taken alone may be descriptive of the restaurant's grill, the term 'Firebirds' is not obviously descriptive of Plaintiff's services. Thus, the mark is at the very least suggestive."); *Am. Rice Inc.*, 518 F.3d at 330 (concluding district court did not clearly err in finding that an "image of a girl icon being used to sell rice is not intrinsic to rice as a product").

The Woodfire Rotisserie Chicken Marks, on the other hand, are best classified as descriptive. The words "cowboy chicken" and "wood fire rotisserie" undoubtably reference the type of cuisine that Plaintiff offers: rotisserie chicken cooked over a wood fire. *See Asazu L.L.C.*, 2023 WL 8244046, at *3 ("The KOMÉ mark is best classified as descriptive. . . . The word 'KOMÉ' translates to 'uncooked rice,' which undoubtably references a staple ingredient in [Plaintiff's] Japanese cuisine including sushi."). Although the Court does not have information before it to assess whether the Woodfire Rotisserie Chicken Marks have acquired secondary meaning, the Court need not reach the issue because the mark's strength is supported by its registration and incontestability. The last of the Woodfire Rotisserie Chicken Marks was registered in 2019, *see supra* note 4, and all the marks have been in continuous use for more than five consecutive years since then. *See Asazu L.L.C.*, 2023 WL 8244046, at *4 ("The weaker classification does not doom [Plaintiff] because the Court finds sufficient pleadings to support the mark's standing and incontestability. . . . The KOMÉ mark is incontestable because it is a registered mark that has been in 'continuous use' for more than 'five consecutive years subsequent to the date of such registration and is still in use in commerce.' . . . The KOMÉ mark therefore has enhanced strength by the fact of its incontestability."); *see also Am. Rice, Inc.*, 518 F.3d at 331 ("The

record shows that [Plaintiff's] mark is incontestable and that ARI was the first to market rice with a girl icon on its rice bags. . . . Thus, even if [Plaintiff's] Girl Design is considered to be descriptive instead of fanciful, . . . it is still a strong mark because of its strong established secondary meaning in the market. Furthermore, even if the mark is descriptive with an acquired secondary meaning, its incontestable status provides [Plaintiff] protection."); *Energy Alchemy, Inc.*, 2025 WL 2625586, at *5 ("[A] mark that is 'incontestable' due to registration with the USPTO—as is the 'MI DIA' mark—is also afforded more weight."); *Firebirds Int'l, LLC*, 397 F. Supp. 3d at 861 ("The Court also recognizes that the strength of the Firebirds mark is enhanced because of its PTO registration. A mark that is 'incontestable' is afforded more weight under this digit. . . . the Firebirds mark is incontestable and thus 'protected from challenge by a presumption of validity.' . . . This evidence can be considered when determining strength."). Accordingly, this factor—the strength of Plaintiff's marks—weighs in favor of a finding of likelihood of confusion.

b. Similarity of Designs

The similarity between the marks' designs is determined "by comparing the marks' appearance, sound, and meaning." *Asazu L.L.C.*, 2023 WL 8244046, at *4 (citing *Elvis Presley Enters.*, 141 F.3d at 201). The key inquiry "is whether, under the circumstances of use, the marks are sufficiently similar

that prospective purchasers are likely to believe the two users are somehow associated." *Id.* "In assessing mark similarity, we 'give more attention to the dominant features of a mark.'" *Firebirds Int'l, LLC*, 397 F. Supp. 3d at 863. Ownership of a mark "is not undermined by the word mark's varying styles, fonts, and sizes on the licensed products." *Viacom Int'l*, 891 F.3d at 189 (explaining that for a word mark—not a design mark—"the focus is whether the words themselves are consistently used as an indicator of source.").

First, with respect to the Cowboy Word Marks and Defendants' marks, the dominating feature of both marks is the word "Cowboy Chicken," which illustrates the marks are sufficiently similar. *Asazu L.L.C.*, 2023 WL 8244046, at *4 ("[T]he dominating feature of both marks is the word 'KOME,' which illustrates the marks are sufficiently similar."); *Viacom Int'l*, 891 F.3d at 193 ("Logos for the two marks may differ, but the words themselves are indistinguishable and would likely confuse consumers as to the source, affiliation or sponsorship . . . ."); *id.* (finding Defendant's proposed mark for the name "The Krusty Krab" was the same as Plaintiff's "The Krusty Krab" word mark); *Firebirds Int'l, LLC*, 397 F. Supp. 3d at 864 (finding the disputed words—"Firebirds" versus "Firebird"—were similar and used in the same context (*i.e.* the parties' logos), where the court gave more attention to the dominant features of the marks despite Plaintiff's mark emphasizing "F" and

"S" and sometimes appearing alongside different words and Defendants' mark included a flame but Plaintiff's did not); *Streamline Prod. Sys., Inc.*, 851 F.3d at 454 (finding "Streamline Production Systems" and "Streamline Manufacturing" to be similar by focusing on the dominant features of "Streamline" in both marks and considering the similarity of the context in which the two marks often appeared—each company's logo); *Energy Alchemy, Inc.*, 2025 WL 2625586, at *5 (finding the parties' use of the marks "Mi Dia" was "virtually identical and [were] both used for the same service—a restaurant that serves Mexican food"). As such, this factor—the similarity of Plaintiff's Cowboy Word Marks and Defendants' use of "Cowboy Chicken"—weighs in favor of a finding of likelihood of confusion.

Second, assessing Plaintiff's Cowboy Chicken Character Mark and Defendants' Chicken Character presents a closer question. On one hand, the characters both depict a cartoon chicken in a cowboy hat and boots, along with a lasso and a display of the word "Cowboy Chicken." On the other hand, Plaintiff's Cowboy Chicken Character Mark is of an aesthetically older style, with an emphasized hat, a protruding closed beak, a vest, shorts, and a downward lasso spelling out "Cowboy Chicken," while Defendants' Chicken Character—both the original and revised version—is a more contemporary cartoon, with a small hat, a proportional open beak, a red bandana/scarf over

its torso, jeans, a guitar, and an upward lasso around the business name. Although close, and because Defendants do not argue to the contrary, the Court considers these differences and concludes that the similarities are sufficient to persuade the Court that the designs are similar. *See Am. Rice, Inc.*, 518 F.3d at 331 ("The district court found ARI's and PRMI's designs to be very similar. The marks both depict young women with similar hair, dress, and features, posed behind a rectangular shape, holding a bowl of rice, and utilizing the same color scheme of red, yellow, and black. . . . ARI's Girl Design depicts a visibly Asian girl, while PRMI's Girl with a Hat Design incorporates a scarf or hat on the head of the girl. The district court considered these differences and concluded that the similarities were sufficient to persuade it that the designs are very similar. This finding is not clearly erroneous."). As such, this factor—the similarity of Plaintiff's Cowboy Chicken Character Mark and Defendants' Chicken Character—weighs in favor of a finding of likelihood of confusion.

Third, with respect to the Woodfire Rotisserie Chicken Marks, there is no evidence that Defendants' use of its marks is similar to these marks. The Woodfire Rotisserie Chicken Marks are designed with the outline of a chicken over woodfire logs with the words "cowboy chicken" and "wood fire rotisserie" in various styles and sizes, and there is no evidence that Defendants have used marks with similar designs. Therefore, this factor—the similarity of Plaintiff's

Woodfire Rotisserie Chicken Marks and Defendants' marks—weighs against a finding of likelihood of confusion.

c. Similarity of Products and Services

"'The greater the similarity of products and services, the greater the likelihood of confusion.'" *Asazu L.L.C.*, 2023 WL 8244046, at *4 (citing *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 229 (5th Cir. 2009)). "The parties need not be in direct competition for a court to find similarity between their products and services." *Id.* Both parties utilize the "Cowboy Chicken" marks to offer restaurant services and market southern-styled cuisine featuring rotisserie chicken. Plaintiff avers that both parties "operate relatively casual dining experiences." (ECF No. 37 at 18). While the Court is not given more facts, such as the formality of each party's restaurant services, the Complaint sufficiently shows a similarity of services. *See Asazu L.L.C.*, 2023 WL 8244046, at *4 ("Both Asazu and CAC utilize the "KOME" mark to offer Japanese cuisine featuring sushi. . . . While the Court is not given more facts, such as the formality of each party's restaurant services, the Complaint sufficiently shows a similarity of services. Therefore, this factor weighs in favor of a finding of likely confusion."); *see also Energy Alchemy, Inc.*, 2025 WL 2625586, at *5 (noting the "Mi Dia" marks were "both used for the same

service—a restaurant that serves Mexican food."). Therefore, this factor weighs in favor of a finding of likelihood of confusion.

d. Identity of Retail Outlets and Purchasers

"The greater the overlap between the outlets for, and consumers of, the services, the greater the potential for confusion." *Asazu L.L.C.*, 2023 WL 8244046, at *4 (citation omitted). "When the products or services do not compete, 'the confusion at issue is one of sponsorship, affiliation, or connection.'" *Id.* (quoting *Elvis Presley Enters.*, 141 F.3d at 202). "The danger of confusion as to affiliation increases when the junior mark user is servicing a market 'into which the senior [mark] user would naturally expand.'"[15] *Id.*

The parties' retail outlets are similar as southern restaurants serving chicken menu options, including rotisserie chicken. (ECF No. 1 at 4, 7–10). However, the similarity between the parties' consumers is not clear. Plaintiff merely states, in conclusory fashion, that the parties "likely have significant overlap on customers who are not likely to engage in any substantial scrutiny

[15] Deborah F. Buckman, *Reverse Confusion Doctrine Under Lanham Trademark Act*, 187 A.L.R. Fed. 271 (2003) ("A likelihood of confusion may arise in one of two ways. The more traditional, or 'forward' confusion, occurs when a junior user of a mark uses it to sell goods or services based on the misperception that they originate with the mark's senior user. Reverse confusion is the opposite—the misimpression that a junior user is the source of a senior user's goods. It is the situation in which a generally large and powerful junior user saturates the market with a trademark which is the same as or similar to a small senior user's trademark, overwhelming the senior user and stripping it of the value of its trademark.").

in differentiating between [the parties'] products and services." (ECF No. 37 at 18).

"Part of the inquiry appears to rest on the distance between the parties' establishments." *Asazu L.L.C.*, 2023 WL 8244046, at *4 (citing *Cross Trailers, Inc. v. Cross Trailer Mfg. & Sales, LLC*, 363 F. Supp. 3d 774, 783 (W.D. Tex. 2018) (confirming applicability of considering geographically distinct markets)). As it stands, Plaintiff has nineteen locations: two in Oklahoma (Oklahoma City and Edmond), one in Louisiana (Baton Rouge), one in Georgia (McDonough), one in Florida (Kissimmee), and the remainder in Texas, with the majority being near the Dallas-Fort Worth area except for McAllen and Longview.[16] Defendants, however, operate one restaurant in Houston, Texas. Given the proximity between Dallas and Houston, it is only possible and not probable that there is some overlap in the parties' consumer base. The Court does not have other facts to sufficiently support a finding of similar consumers. *See Asazu L.L.C.*, 2023 WL 8244046, at *4 ("[G]iven the proximity between Dallas and Austin, it is only possible and not probable that there is some overlap in the parties' consumer base. The Court does not have other facts to sufficiently support a finding of similar consumers.") (internal citation

---

[16] (*See* ECF No. 1 at 4 ("Plaintiff's 'Cowboy Chicken' restaurants have grown from the original location in Dallas, Texas, in 1981, to approximately 19 locations, with both franchise and affiliated locations.")); *see also* COWBOY CHICKEN, LOCATIONS, https://www.cowboychicken.com/locations/ (last visited Oct. 6, 2026).

omitted); *cf. Reservoir, Inc. v. Truesdell*, 1 F. Supp. 3d 598, 610 (S.D. Tex. 2014) (finding the identity-of-retailers-and-purchasers factor favored confusion where the parties operated the same type of business under the same mark in the same general geographic area (in Houston and Austin), including clubs located approximately thirty miles apart from Houston and the Woodlands, and targeted an overlapping customer base); *Energy Alchemy, Inc.*, 2025 WL 2625586, at *1, 5 (finding the parties had a large overlap between their respective consumers, where they *both* operated Mexican restaurants in and had "restaurant goers in the [Dallas-Fort Worth] area").

By way of illustration, neither the Complaint nor Motion for Default Judgment "plead any facts or empirical data, such as demographics or consumer surveys, that would suggest the parties' restaurants have overlapping consumer bases." *Asazu L.L.C.*, 2023 WL 8244046, at *5; *see also Viacom Int'l*, 891 F.3d at 195 (finding the extent of overlap between purchasers could not be adequately gauged where the record contained no empirical data regarding consumer overlap, despite some reasonable inference of shared consumers).

In fact, it is not clear to the Court whether Defendants' customers even know of Plaintiff's restaurant or its reputation to make a connection between the two restaurants. *See T.G.I. Friday's, Inc. v. Int'l Rest. Grp., Inc.*, 569 F.2d

895, 899 (5th Cir. 1978) (affirming district court finding that "the physical similarities between the restaurants were irrelevant to the issue of infringement since the [Plaintiff's] chain had no reputation in the [Defendant restaurant's] area.").

The Complaint also does not plead any facts suggesting the public perceives Plaintiff as likely to "naturally expand" into Houston such that the Court may infer similar customers. *See Asazu L.L.C.*, 2023 WL 8244046, at *5 (noting the complaint did not plead any facts suggesting the public perceived the plaintiff's Austin-based restaurant as likely to "naturally expand" into Dallas where the defendant was based, such that the Court could infer similar customers). "Given the factual holes as to similarity of consumers, the Court does not find this factor supports likely confusion." *Id.*

e. Similarity of Advertising Media Used

"The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Viacom Int'l.*, 891 F.3d at 195. When "[b]oth companies use print advertisements, direct mailings, and Internet promotion" it "supports an inference that the parties use similar advertising and marketing channels." *Id.* "On the other hand, when one mark advertises nationally and the other mark advertises locally in a specialized manner, there are significant differences between the advertising media used." *Id.* "Absent

any existing advertising by [Defendant], it is difficult to assess the similarity between the campaigns." *Id.* This digit is "minimally probative" when a defendant does not advertise and the record "[is] unable to provide much information about these ads." *Id.* *See also Streamline Prod. Sys., Inc.*, 851 F.3d at 455 ("[B]ecause the evidence demonstrates that SMI engaged in minimal advertising, this digit is 'minimally probative' of likelihood of confusion."); *Bd. of Supervisors for La. State U. Agric. and Mech. College v. Smack Apparel Co.*, 550 F.3d 465, 481 (5th Cir. 2008) (concluding this digit was "minimally probative" where evidence showed that one of the companies did not advertise beyond "limited sales" from its website).

In the Complaint, Plaintiff alleges it has "expended substantial time, money, and other resources in developing advertising, and otherwise promoting" its marks. (ECF No. 1 at 7). Plaintiff also alleges Defendants have infringed Plaintiff's marks "online, in advertising, and as used in connection with Defendants' similar and competing services within the restaurant industry." (*Id.* at 11). Plaintiff further alleges Defendants have no right to use Plaintiff's marks "in connection with the advertising, promotion, or offer of any restaurant services, including but not limited to online on its social media pages or in person as its physical location in Texas." (*Id.* at 12). Plaintiff contends that Defendants "us[e] the same advertising channels in connection

with the same or confusingly similar marks." (*Id.* at 14). In the motion for default judgment, Plaintiff recites these same allegations (ECF No. 37 at 5, 7) but does not further elucidate its allegations while addressing this factor.

The Court therefore cannot discern the similarity in the parties' advertising campaigns. For instance, the Court cannot tell whether both parties "use print advertisements, direct mailings, and Internet promotion" *Viacom Int'l.*, 891 F.3d at 195. Although Plaintiff contends that Defendants use the same advertising channels, Plaintiff does not explain what exactly these channels are. *Cf. Energy Alchemy, Inc.*, 2025 WL 2625586, at *5 (finding this factor favored a likelihood of confusion at the summary judgment stage where there was evidence "[b]oth Plaintiff and Defendants also both use physical signs, their respective websites, and their respective social media pages to advertise their restaurants."); *Firebirds Int'l, LLC*, 397 F. Supp. 3d at 865–66 (finding this factor favored a likelihood of confusion at the summary judgment stage where the plaintiff provided "ample evidence" that the disputed mark was used in connection with Defendants' advertising of their restaurant group and with third-party marketing companies, including examples of the mark being used in online, social media, and in-restaurant ads, in connection with a charity event, and on Glassdoor and Indeed).

Additionally, considering Plaintiff may advertise nationally in light of its multi-state presence, and Defendants may advertise locally due to its sole location in Houston, there may be "significant differences between the advertising media used." *Viacom Int'l.*, 891 F.3d at 195. "Absent any existing advertising by [Defendants], it is difficult to assess the similarity between the campaigns." *Id.* This digit is therefore minimally probative because the record "[is] unable to provide much information about these ads."[17] *Id.* Accordingly, the Court finds this factor is neutral.

f. <u>Defendant's Intent</u>

"Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference that there is a likelihood of confusion." *Streamline Prod. Sys., Inc.*, 851 F.3d at 455 (quotation omitted). But "mere awareness" of the senior user's mark does not "establish[ ] . . . bad intent." *Id.* (quoting *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)). Courts have looked for evidence that the defendant made efforts "to pass off its product as that of the plaintiff through 'imitation of packaging material' or 'adopting . . . similar distribution

[17] Although Plaintiff provides links to Facebook and Instagram posts and food delivery websites connected to Defendants' business generally (ECF No. 1 at 7–9), it is not clear if these mediums are similar to Plaintiff's advertising campaigns. In any event, because Plaintiff's mark may be advertised nationally and Defendants' mark may be advertised locally, the Court infers that there are likely significant differences between the advertising media used. *Viacom Int'l*, 891 F.3d at 195.

methods.'" *Id.* (citation modified). An intent to confuse may be found when the evidence indicates that the defendant, in choosing its mark, knew about the plaintiff's mark and intended to capitalize on the plaintiff's popularity. *Id.* An intent to confuse may be found when the defendant did not choose the mark with intent to confuse but subsequently used the mark in a way that "evidenced an intent to trade on [the senior user's] reputation." *Id.* "If there is no evidence of intent to confuse, then this factor is neutral." *Viacom Int'l*, 891 F.3d at 195.

Plaintiff pleads that Defendants learned of Plaintiff's rights to the marks from the pre-suit notice and continued to use the alleged infringing marks. (ECF No. 1 at 11–13). Plaintiff also argues Defendants exhibited bad intent because after receiving notice of Plaintiff's rights, they expanded by opening a second location under the same infringing marks. (*Id.* at 11; ECF No. 37 at 23–24). But Plaintiff's arguments ring hollow for several reasons.

First, Plaintiff concedes that, upon receiving the January 2025 cease-and-desist letter, "Defendant Lucia Macias responded on behalf of Defendants in February 2025, claiming that they were not aware their use was infringing and seeking guidance as to how to remedy the situation." (ECF No. 1 at 11). Defendants' filings with the Court also expressed a lack of bad intent. (*See, e.g.*, ECF No. 9-1 ("We were unaware of the existence of a federally registered

trademark. Once we were notified, we acted promptly and changed our legal business name to . . . avoid any possible confusion. . . . We have no intention of benefiting from or creating confusion with your trademark."); ECF No. 18 ("We have already replaced our signage, menus, business cards, and online presence to reflect the new name, and we have no intention of ever using the disputed name again. We wish to demonstrate to the Court that we have acted in good faith to resolve any concerns related to trademark use.")). Second, "a defendant's continued use of a mark even after it receives a cease and desist letter cannot be construed as evidence of intent to confuse." *Streamline Prod. Sys., Inc.*, 851 F.3d at 456 (citing 4 McCarthy on Trademarks and Unfair Competition § 23:120 (4th ed.)) (finding the factor for intent to confuse weighed against finding a likelihood of confusion, where the defendant "engaged in a cost-benefit analysis in deciding to continue using its name after receiving the [cease-and-desist] letter"). Third, the Court has already addressed the lack of evidence that Defendants have in fact opened a second location under the name Cowboy Chicken Peruvian. *See supra* note 7.

Based on this record, the Court cannot reasonably infer that Defendants intended to pass off its restaurant as affiliated with Plaintiff's brand. Either this factor is neutral because there is no evidence of intent to confuse, or this factor weighs against a finding of likely confusion because there is affirmative

evidence Defendants *did not intend* to confuse. *Cf. Asazu L.L.C.*, 2023 WL 8244046, at *5 (finding the intent-to-confuse factor was neutral, where the plaintiff did not provide additional facts supporting defendant's intent to confuse and the court could not analyze the factor further); *Firebirds Intl., LLC*, 397 F. Supp. 3d at 866 (finding the intent-to-confuse factor was neutral, where the defendants' awareness of the plaintiff's mark, coupled with continued use after awareness, was not sufficient to establish bad intent at the summary-judgment stage); *Viacom Int'l*, 891 F.3d at 196 (finding the intent-to-confuse factor did not support a finding of a likelihood of confusion, where it was "not clear" whether the defendant intended to derive benefits from the plaintiff's reputation and his company's "malevolence [was] circumstantial").

g. Actual Confusion

Actual confusion is the "best evidence of a likelihood of confusion." *Viacom Int'l.*, 891 F.3d at 197. "To show actual confusion, a plaintiff may rely on anecdotal instances of consumer confusion or consumer surveys." *Id.* The evidence should show "more than a fleeting mix-up of names;" it should show "actual confusion about the origin of the parties' products," such that the "confusion was caused by the trademarks employed and it swayed consumer purchases." *Xtreme Lashes, LLC*, 576 F.3d at 230; *see also Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d at 487 ("To prove infringement, [Plaintiff]

must ultimately prove that a misleading representation by [Defendant], as opposed to some other source, caused a likelihood of confusion.").

Plaintiff alleges Defendants' acts "are intended to cause, have caused, and are likely to continue to cause confusion or mistake, or to deceive consumers, the public, and the trade into believing that Defendants' restaurant services and goods originate with [Plaintiff]." (ECF No. 1 at 14). But Plaintiff offers no factual support for this allegation. Nothing in the Complaint or Motion for Default Judgment addresses actual confusion among consumers. The Court therefore finds this factor neutral as to likely confusion. *See Asazu L.L.C.*, 2023 WL 8244046, at *5 (finding this factor as neutral where the plaintiff offered no factual support for the allegation that the defendant's use of the mark had "already caused confusion among the relevant public" nor clarification as to the meaning of "relevant public"); *see also Nishimatsu Constr. Co.*, 515 F.2d at 1206 ("[A] defendant's default does not in itself warrant the court in entering a default judgment. There must be a sufficient basis in the pleadings for the judgment entered. . . . The defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.").

h. Degree of Care

"Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Xtreme Lashes,*

*LLC*, 576 F.3d at 231 (quoting *Smack Apparel*, 550 F.3d at 483). "However, a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar." *Id.* (citation omitted).

Plaintiff hardly grapples with this factor beyond its motion for default merely contending that, the parties "likely have significant overlap on customers who are not likely to engage in any substantial scrutiny in differentiating between Plaintiff and the LLC Defendant's products and services." (ECF No. 37 at 18). In Plaintiff's view, this factor therefore indicates a likelihood of consumer confusion. *Id.*

But it is not clear what level of dining, price points, or the type of restaurant goers the restaurant businesses cater to. The Court therefore finds this factor is neutral. *See generally Asazu L.L.C.*, 2023 WL 8244046, at *5 (finding this factor was neutral because nothing in the Complaint addressed the degree of care exercised by potential consumers); *Firebirds Int'l, LLC v. Firebird Rest. Grp., LLC*, 397 F. Supp. 3d at 868 ("Plaintiff argues this factor weighs in its favor because the concept of its restaurants is to provide upscale dining at an affordable price point. Defendants continue to rely on the argument that their customers are not restaurant goers but restaurant businesses needing management services, and thus their customers are making informed, deliberative decisions when contracting with them. The

Court believes that this reoccurring fact issue is best resolved at trial. Thus, this factor is neutral." (internal citations omitted)); *Reservoir, Inc.*, 1 F. Supp. 3d at 610 ("Plaintiffs have offered no proof of the 'degree of care' exercised by customers of any Rebels location, making this factor neutral.").

To be sure, Plaintiff's discussion of the factors leaves much to be desired. *See Asazu L.L.C.*, 2023 WL 8244046, at *5 (concluding that there was an insufficient basis to conclude there was a likelihood of confusion among consumers as to the affiliation between the plaintiff's and defendant's restaurants, where the two factors of "particular prominence"—actual confusion and bad intent—were notably absent and only three out of the eight factors favored a finding of likely confusion); *id.* ("The Court ultimately does not have sufficient factual evidence to conclude that [Plaintiff] has successfully established [Defendant's] liability as to trademark infringement and unfair competition."). On balance, however, the Court concludes that there is a sufficient basis to conclude there is a likelihood of confusion as to the affiliation between Defendants' marks and Plaintiff's Cowboy Word Marks and Cowboy Chicken Character Mark, but not its Woodfire Rotisserie Chicken Marks. The digits of confusion—particularly the strength of Plaintiff's marks, the identical spelling and pronunciation of the word marks, the similarity of the character marks, and the marks' identification of similar restaurant services and similar

products (e.g., rotisserie chicken)—dictate that the LLC Defendant's use of the word- and chicken-character- marks probably infringes on Plaintiff's trademarks. *Cf. Viacom Int'l*, 891 F.3d at 198 ("The digits of confusion—particularly the strength of Viacom's [Krusty Krab] mark, the identical spelling and pronunciation of the marks, both marks' identification of restaurants, and evidence of actual confusion—dictate that [Defendant's] use of the mark infringes on Viacom's trademark."); *Streamline Prod. Sys., Inc.*, 851 F.3d at 458 ("Although the digits of confusion do not point in a uniform direction, at least some weigh in favor of finding a likelihood of confusion."). Having addressed trademark infringement, the Court now turns to Plaintiff's claim for unjust enrichment.

2. Unjust Enrichment

"Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Streamline Prod. Sys., Inc.*, 851 F.3d at 462 (citation omitted). "A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Id.* (citation omitted). While evidence that the defendant had attempted to "palm off" its goods for those of the plaintiff is not a "prerequisite to finding unjust enrichment, it is an important circumstance bearing on the

determination." *Id.* (citing *Texas Pig Stands, Inc. v. Hard Rock Cafe Int'l, Inc.*, 951 F.2d 684, 695 (5th Cir. 1992)). Evidence of diverted sales and lost profits can justify an unjust enrichment award. *Id.* at 463. "The Fifth Circuit has also rejected unjust enrichment claims in trademark infringement cases for insufficient evidence, but not because the claims were inappropriate as a matter of law when a Lanham Act claim was brought." *Firebirds Int'l, LLC*, 397 F. Supp. 3d at 873 (citing *Streamline Prod. Sys., Inc.*, 851 F.3d at 462–63 and *Texas Pig Stands, Inc.*, 951 F.2d at 694–96).

Here, Plaintiff has not presented sufficient evidence of unjust enrichment. As is evident by Defendants' filings and representations to this Court, there is no indication Defendants obtained a benefit from Plaintiff by fraud, duress, or the taking of an undue advantage. There is also no evidence that Defendants attempted to "palm off" its goods for those of Plaintiff's, and there is no evidence of diverted sales and lost profits on account of Defendants' conduct. *See Texas Pig Stands, Inc.*, 951 F.2d at 695 ("On a review of the evidence, we conclude that there is simply no indication that [Defendant] attempted to 'palm off' its pig sandwiches as those of [Plaintiff], nor did they attempt to associate their operation with [Plaintiff]. [Plaintiff] acknowledges that it did not lose a single sale due to [Defendant's] use of 'pig sandwich.'").

As such, the Court concludes there is an insufficient basis for default judgment as to Plaintiff's unjust enrichment claim.

Having analyzed the merits of Plaintiff's claims and whether there is a sufficient basis in the pleadings for the judgment, the Court now turns to the form of relief Plaintiff should receive.

**C. Relief for Plaintiff's Claims**

In its motion for default judgment, Plaintiff requests (1) a permanent injunction enjoining the LLC Defendants from using Plaintiff's marks; (2) costs; (3) attorneys' fees; and (4) an accounting of profits and expenses. (ECF No. 37 at 19–27).

1. Scope of Relief and the Implication of the Pending Defendants

Before addressing the specific relief Plaintiff seeks, the Court must consider the implications of granting default judgment against the LLC Defendant while the individual Defendants remain in the case. Under *Frow v. De La Vega*, 82 U.S. 552 (1872), where defendants share a common theory of liability, a court should not enter default judgment against a defaulting defendant if doing so risks producing a judgment logically inconsistent with a later ruling on the merits as to the answering defendants. A district court out of the Western District of Texas has thoroughly explained how courts have applied *Frow* in various ways—looking not only to the form of liability, but to

whether the defendants are similarly situated, possess closely related defenses, or face joint and several liability.[18] *See Holland*, 2025 WL 2492965, at *2–3 (Griffin, J.) (explaining there is a circuit split in *Frow's* application and the Fifth Circuit "has yet to weigh in on its preferred approach" other than citing it twice but without specifically endorsing either approach); *Spec. Material Co. v. Kodiak Energy Servs., LLC*, No. 25-cv-00100, 2025 WL 3723721, at *2–3 (W.D. Tex. Dec. 5, 2025), *report and recommendation adopted*, No. 25-cv-00100, 2025 WL 3724151 (W.D. Tex. Dec. 22, 2025) (Griffin, J.) (same); *see also Knowles-Carter v. Feyonce, Inc.,* No. 16-cv-2532, 2017 WL 11567528, at *3–6 (S.D.N.Y. Sep. 23, 2017) (Nathan, J.) (explained how courts have applied *Frow* in various ways and collecting cases from the Second Circuit). "[T]he overwhelming majority of cases in the [Western] district indicate default judgment only as to the defaulting defendant should be denied if the parties are similarly situated and possess closely related defenses, where all defendants are jointly and severally liable, or when premature default presents a risk of inconsistent judgments. The Court here follows the beaten path." *Holland*, 2025 WL 2492965, at *2–4 (collecting twenty-four cases in the Western District and analyzing their different approaches). The threshold

[18] Plaintiff's Complaint requests the Court to enter judgments against Defendants "jointly and severally." (ECF No. 1 at 20). The Motion for Default Judgment against only the LLC Defendant does not discuss joint and several liability. (*See* ECF No. 37).

question is therefore whether granting default judgment against the LLC Defendant at this stage would present a risk of inconsistent judgments with any future ruling on the merits as to the individual Defendants. The Court concludes it would not.

Here, on one hand, the LLC Defendant and individual Defendants are similarly situated because they act in concert with the restaurants' services and the alleged infringing use of Plaintiff's marks by virtue of operating the business. Defendants also possess closely related defenses—namely, whether the use of their marks in connection with their restaurant presents a likelihood of confusion with Plaintiff's marks. But on the other hand, it is not certain if the individual Defendants actually oppose the claims, as they have seemingly capitulated by rebranding, and they have expressed they are "willing to sign any written agreement confirming that [they] will never use the disputed name again." (ECF No. 26 at 2). *Cf. Knowles-Carter*, 2017 WL 11567528, at *3–6 (denying motion for default judgment in part because, although the Corporate Defendant defaulted, the Individual Defendants continued to actively litigate and deny the allegations in the Complaint).

What's more, Defendants cannot be jointly and severally liable. This is because Mr. Arredondo and Ms. Macias, as members of the LLC, cannot be liable for the LLC's debts, obligations, or liabilities. *See supra* note 5; *Gill v.*

*Grewal*, No. 4:14-cv-2502, 2020 WL 3171360, at *8 (S.D. Tex. June 15, 2020) ("[M]embers of an LLC cannot normally be held liable for the debts, obligations, or liabilities of an LLC." (citing TEX. BUS. ORGS. CODE § 101.114; *Kennebrew v. Harris*, 425 S.W. 3d 588, 600–01 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (finding that a member of an LLC cannot be jointly and severally liable for the LLC's breach of an operating agreement and other contracts into which the LLC entered))); *see also Aurora Astro Prods. LLC v. Celestron Acq., LLC*, No. 5:20-cv-03642, 2023 WL 5957178, at *5 (N.D. Cal. Sep. 12, 2023) ("[J]oint and several liability is not dispositive of whether *Frow* precludes entry of judgment."). As such, there is no joint and several exposure between the LLC and its members that would generate irreconcilable judgments.[19]

[19] The individual Defendants could face personal liability not as members derivatively responsible for the LLC's obligations, but as direct infringers in their own right. The Lanham Act permits individual liability for those who personally participate in or direct infringing conduct, independent of the corporate or LLC structure. *See, e.g.*, *Luxottica Grp., S.p.A. v. Ochoa's Flea Mkt., LLC*, No. 7:20-cv-00061, 2022 WL 836823, at *14–15 (S.D. Tex. Mar. 21, 2022) (holding that co-owners and operators of a flea market could face individual liability for contributory trademark infringement under the Lanham Act without piercing the corporate veil); *Luxottica Grp., S.p.A. v. Lollis LLC*, No. 5:21-cv-47, 2021 WL 5074653, at *1 (S.D. Miss. July 29, 2021) ("Under federal trademark law, it has long been established that there can be individual liability for infringing activity. . . . Thus, [a]n individual can be held personally liable if he actively and knowingly caused the infringement." (citations and quotations omitted)). Even under that theory, however, individual liability would run to Mr. Arredondo and Ms. Macias personally as direct actors— not derivatively through the LLC— and would be determined on the merits of their own conduct in separate proceedings. It therefore presents no joint and several exposure between the LLC and the individuals that would create the kind of inconsistent judgments contemplated by *Frow*.

And, importantly, granting default judgment against the LLC Defendant, as recommended here, does not present a risk of inconsistent judgments. *See Aurora Astro Prods. LLC,* 2023 WL 5957178, at *5 ("The principal concern identified in *Frow* is outcome-based[.]"); *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1257–58 (7th Cir. 1980) ("[W]hen different results as to different parties are not logically inconsistent or contradictory, the rationale for the *Frow* rule is lacking."). Beginning with the judgment against the LLC Defendant: here, it is limited to a preliminary injunction and an award of costs (for litigating the default judgment *against the LLC*). Because the individual Defendants remain in the case, the Court construes Plaintiff's request for injunctive relief as one for a preliminary injunction rather than a permanent injunction, to mitigate the possibility that the individual Defendants' separate adjudication results in a different outcome. *See 1661, Inc. v. PESJ Holding Co., LLC*, No. 23-cv-10853, 2025 WL 2630201, at *7–8 (C.D. Cal. July 31, 2025) (granting default judgment against a defaulting corporation by construing the requested permanent injunction as a preliminary injunction while an individual pro se defendant remained, reasoning that entry of final judgment should await adjudication as to all defendants given the possibility that the individual defendant's litigation could result in a different outcome for her than as to the corporation).

If the litigation were to proceed against the individual Defendants, any injunction *as to them*, can be broader, or narrower. There is nothing irreconcilable between preliminarily enjoining the LLC Defendant from further infringement based on its default, and a later finding—whether for or against the individual Defendants—on the merits of the trademark claims.[20] A narrower or broader injunction against the individuals later simply reflects their separate adjudication, not a contradiction. Conversely, a similar injunction would reflect consistency. Or, as indicated by Defendants' filings that they would sign an agreement to not use the marks, they could stipulate to an injunction. Ultimately, the preliminary injunction would be resolved after an adjudication of the continuing litigation's merits. In addition, any

[20] There is likewise no issue of nonmutual offensive claim or issue preclusion because "it is a 'venerable principle that a default judgment against one defendant does not preclude a co-defendant from contesting the plaintiff's claim." *Levitation Arts, Inc. v. Fascinations Toys & Gifts*, Inc., No. 07-cv-990, 2009 WL 10669490, at *3 (W.D. Tex. May 28, 2009) (concluding the answering defendants' defenses remained to be tested at trial and were free to dispute plaintiff's, regardless of the entry of a default judgment against a separate corporation, the non-answering defendant); *but see id.* at *5 (denying plaintiff's motion for default judgment without prejudice as premature, where the non-answering corporation was similarly situated to the answering defendants and such a judgment would run the risk of inconsistent adjudications); *see also Yilmaz v. Mann*, No. 13-cv-80351, 2014 WL 1018006, at *3 (S.D. Fla. Mar. 17, 2014) (concluding default judgment against an LLC did not collaterally estop its managing member from litigating the issue of the LLC's liability; even if the LLC and the managing member were identical parties, "default judgment for failure to obtain counsel . . . [did] not warrant the Court's diversion from the rule that 'default judgment will not support the application of collateral estoppel.'"); *Aeronet Worldwide, Inc. v. AB&M Interstate Servs., Inc.*, No. 622-cv-01081, 2023 WL 6599077, at *5 (N.D.N.Y. Oct. 10, 2023) ("[D]efault judgments have no collateral estoppel effect against non-defaulting defendants in the same litigation."). Also, notwithstanding the foregoing accompanying text, if the individual Defendants were to prevail on an issue going to the default judgment, Rule 55(c) provides a potential recourse.

potential future award of costs would be for costs incurred in litigating *against the individual Defendants*—for example, in a dispositive motion or at trial.

Moreover, there is no risk of inconsistent monetary judgments—i.e., inconsistent damages, attorneys' fees, or an accounting of profits, because, for the reasons discussed below, none are awarded here. *See In re Uranium Antitrust Litig.*, 617 F.2d at 1262 (explaining that the possibility of two different damages determinations between defaulters and answering defendants arising out of a single claim presents an inconsistency); *see id.* ("[W]hile [Plaintiff] has secured a valid default judgment as to the defaulters' liability, a damages hearing may not be held until the liability of each defendant has been resolved."); *see also Streamline Prod. Sys., Inc.*, 851 F.3d at 459 ("[M]onetary damages are not warranted in trademark infringement cases if '[a]n injunction alone . . . fully satisfies the equities of a given case.' This is 'particularly [true] in the absence of a showing of wrongful intent,' or if there is a 'lack of sufficient proof of actual damages'") (citation modified); *Mancillas*, 2025 WL 624548, at *3 ("The Court finds it cannot award Plaintiff damages based on this record. Courts have found certain sums and awarded damages when affidavits are supported by documentary evidence such as invoices, bills, and payment receipts. Without such documentary evidence, the

Court cannot be certain Defendants are liable to Plaintiff for this amount.") (citations omitted).

Thus, to rule on Plaintiff's Motion at this time, in this manner, would not undeniably result in inconsistent judgments. *See Early Warning Servs. LLC v. Johnson*, No. 24-cv-01587, 2025 WL 2097313, at *2–3 (D. Ariz. July 25, 2025) (granting default judgment against a defaulting LLC while individual defendants remained, finding *Frow* inapplicable because the plaintiff did not assert joint or several liability against the other defendants for the same claims, and the relief sought against each defendant would individually require some action without making conclusive findings regarding the other defendants' liability); *Same Day Garage Door Servs. v. Y.N.G. 24/7 Locksmith LLC*, No. 19-cv-04782, 2020 WL 1659913, at *4 (D. Ariz. Apr. 3, 2020) (granting default judgment against a defaulting LLC because the Complaint did not allege that Defendants were jointly liable and there was no just reason to delay, as the LLC had nearly eight months to answer but did not do so); *1661, Inc. v. PESJ Holding Co., LLC*, No. 23-cv-10853, 2025 WL 2630201, at *7–8 (C.D. Cal. July 31, 2025) (granting default judgment and entitlement to attorneys' fees against a defaulting corporation in a trademark action while an individual defendant remained, and construing a preliminary rather than permanent injunction to avoid inconsistent judgments); *1661, Inc. v. PESJ*

*Holding Co., LLC*, No. 23-cv-10853, 2026 WL 413624, at 8 (C.D. Cal. Feb. 9, 2026) (converting the aforementioned preliminary injunction to a permanent injunction and entering final judgment against both defendants after the individual defendant also defaulted, thus resolving the *Frow* concern that had previously counseled against entry of a permanent injunction); *cf. Holland*, 2025 WL 2492965, at *4 (declining to enter default judgment on defendant/cross-plaintiff's crossclaims against defendants/cross-defendants where all defendants were similarly situated, possessed closely related defenses, and granting default would "undeniably result in inconsistent judgments" because the complaint attributed nearly every fact and cause of action to every defendant jointly); *Spec. Material Co.*, 2025 WL 3723721, at *3–4 (denying default judgment as premature against non-answering defendants under the same reasoning, where the "[c]omplaint paint[ed] all the defendants"—answering and non-answering—"as co-conspirators working jointly toward a common goal—defrauding Plaintiff"); *Eagles Nest Outfitters, Inc. v. Taomore, Inc.*, No. 23-cv-466, 2024 LX 246349, at *6–13 (C.D. Cal. 2024) (denying default judgment against a defaulting corporation defendant in a trademark counterfeiting action where the remaining defendants were actively litigating the same theory—that all defendants acted in concert to import and sell counterfeit goods—because "there [was] more than a *mere* possibility of

inconsistent judgments") (emphasis in original). Because the risk of inconsistent judgments is absent and because joint and several liability between the LLC Defendant and the individual Defendants does not exist, proceeding with a limited default judgment against the LLC Defendant is appropriate.[21] The form of relief is therefore significant; and so, to put things into more perspective, the Court will lay out the legal standards for the remedies that Plaintiff seeks.

2. Legal Standard for Lanham Act Remedies

The Lanham Act makes liable "[a]ny person who . . . uses in commerce any word, term, name, symbol, or device, . . . which . . . is likely to cause confusion, or to cause mistake . . . as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a).

---

[21] Then-District Judge Nathan's analysis in *Knowles-Carter* likewise supports this conclusion. Although recognizing that courts disagree over the precise scope of *Frow*, she observed that two principles command near-universal acceptance: (1) default judgment cannot be issued where the relief requested would prejudice actively litigating defendants, and (2) where the plaintiff's theory is at least joint and several liability (if not true joint liability), a court should not enter final judgment as to damages until after conclusion of the merits-phase of the proceedings against the actively litigating defendants. *Knowles-Carter*, 2017 WL 11567528, at *5. Neither concern is present here. The injunctive relief entered against the LLC Defendant does not prejudice the individual Defendants, who have represented that they have agreed to cease use of the challenged marks and have already begun rebranding. And because the Court does not award monetary damages or enter a final damages judgment at this stage, the second principle is likewise not implicated.

Courts "have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the [PTO] or to prevent a violation under subsection (a), (c), or (d) of section 1125." 15 U.S.C. § 1116(a). "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a [Lanham Act] violation . . . in the case of a motion for a permanent injunction." *Id.* A plaintiff is also entitled to this presumption "upon a finding of likelihood of success on the merits for a [Lanham Act] violation . . . in the case of a motion for a preliminary injunction or temporary restraining order." *Id.*

When a Lanham Act violation is established, the plaintiff shall be entitled, subject to the principles of equity, to recover the costs of the action. 15 U.S.C. § 1117(a).[22]

The court in "exceptional cases" *may* award reasonable attorney fees to the prevailing party. *Id.* (emphasis added).

The Fifth Circuit has held that § "1117(a) remedies are awarded subject to the principles of equity," and thus, "an award of the defendant's profits is not automatic." *Am. Rice, Inc.*, 518 F.3d at 338. In determining whether an

[22] *See also* FED. R. CIV. P. 54(c) ("Unless a federal statute, these rules, or a court order provides otherwise, costs--other than attorney's fees--should be allowed to the prevailing party.").

award of profits under § 1117(a) is appropriate in trademark infringement cases, "factors to be considered include, but are not limited to[,] (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off." *Id.*; *see also Firebirds Int'l, LLC*, 397 F. Supp. 3d at 869 (citing same factors).

3. Preliminary Injunction

"Since a preliminary injunction seeks to preserve the status quo ante litem, it is also an appropriate means of maintaining the status quo as of the time the default judgment was entered." *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1259 (7th Cir. 1980) (citation omitted). A court may grant an application for a preliminary injunction "only if the movant establishes (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Bd. of Regents of the Univ. of Hous. Sys. on Behalf of the Univ. of Houston Sys. & Its Member Insts. v. Hous. Coll. of L., Inc.*, 214 F. Supp. 3d 573, 582 (S.D. Tex. 2016). At this default judgment stage, the Court finds it is

appropriate to enter a preliminary injunction enjoining the LLC Defendant from using Plaintiff's Cowboy Word Marks and Cowboy Chicken Character Mark.

Because the Court finds that the digits of confusion weigh in favor of finding a likelihood of confusion as to these marks, *see supra* Part III.B, Plaintiff has met its burden of establishing a substantial likelihood of success that it will prevail on the merits of its trademark infringement claims. *See Bd. of Regents of the Univ. of Hous. Sys.*, 214 F. Supp. 3d at 603 (finding that the digits of confusion weighed heavily in favor of finding a likelihood of confusion, and that the plaintiff therefore carried its burden of establishing a substantial likelihood of success that it would prevail on the merits of its trademark infringement claim).

As mentioned above, the Lanham Act includes a presumption of irreparable injury that is triggered by a finding of a violation of the Lanham Act. *See* 15 U.S.C. § 1116(a); *see also* 4 McCarthy on Trademarks and Unfair Competition §§ 30:47, 30:47:50 (5th ed. 2026) (explaining that the 2020 Amendment to the Lanham Act included a statutory presumption of irreparable injury upon a finding of a Lanham Act violation). Additionally, considering there is no award of damages here, the Court finds that irreparable harm exists because Plaintiff is subject to harm that cannot be adequately

compensated by a remedy at law. *See Bd. of Regents of the Univ. of Hous. Sys.*, 214 F. Supp. 3d at 603 (concluding that monetary damages would not adequately compensate the plaintiff, and that the plaintiff would be irreparably harmed by the defendant's continued use of the disputed mark to identify and market its brand); *Liberty Burger Prop. Co. v. Liberty Rebellion Rest. Grp., LLC*, No. 3:22-cv-00085, 2023 WL 349790, at *6 (N.D. Tex. Jan. 20, 2023) ("In a dispute over trademark infringement and unfair competition, 'when a likelihood of confusion exists, the plaintiff's lack of control over the quality of the defendant's goods constitutes immediate and irreparable harm. . . . The injury lies in the fact that the plaintiff no longer can control its own reputation and goodwill.'") (citation omitted); *see also* 4 McCarthy on Trademarks and Unfair Competition § 30:46 (5th ed. 2026) ("'Irreparable harm' traditionally means that the plaintiff seeking a preliminary injunction will suffer harm that cannot be adequately compensated for by a final judgment of damages months or years in the future. . . . 'Irreparable harm' in a trademark infringement case flows from the fact that once the trademark owner shows a probability of proving a likelihood of confusion, then the trademark owner's business reputation and goodwill are at risk.").

Next, "the third requirement for obtaining a preliminary injunction requires the plaintiff to establish that his irreparable harm is greater than the

hardship that the preliminary injunction would cause the defendant." *Bd. of Regents of the Univ. of Hous. Sys.*, 214 F. Supp. 3d at 604. A party's claim of hardship is given less weight if he chooses "to incur costs in the face of a possible infringement claim." *Id.* When balancing the harms to the plaintiff and defendant, "courts usually hold that when defendants improperly use a plaintiff's trademark, the threatened harm to the plaintiff outweighs the threatened harm to the defendants." *Liberty Burger Prop. Co.*, 2023 WL 349790, at *6 (citation omitted).

Here, the harm to the LLC Defendant is miniscule, as it has already undergone a rebranding to stop using the name "Cowboy Chicken Peruvian Cuisine," to switch to "Antara Chicken Peruvian Cuisine," and to change its business name, exterior signs, social media, online listings, business cards, and advertisements. (*See* ECF No. 24). If an injunction does not issue, any remaining or derivative harm will go unaddressed, such as Defendants' remaining residual use of Plaintiff's marks on multiple websites—including Wheree, Uber Eats, Postmates, DoorDash, Yelp, and MapQuest—and Defendants' use of a graphic of a chicken dressed in western attire swinging a lasso (i.e., the Antara Chicken Character). (ECF No. 37 at 4–6). The Court finds that Plaintiff's irreparable harm is greater than the hardship that the preliminary injunction would cause the LLC Defendant.

Finally, the "public interest is always served by requiring compliance with Congressional statutes such as the Lanham Act and by enjoining the use of infringing marks." *Bd. of Regents of the Univ. of Hous. Sys.*, 214 F. Supp. 3d at 605. The Court finds that protecting Plaintiff in this case from an infringing junior user does not disserve the public's interest. Thus, Plaintiff is entitled to a preliminary injunction to enjoin the LLC Defendant from using Plaintiff's Cowboy Word Marks and Cowboy Chicken Character Mark.

4. Costs

"Recoverable costs are not specifically enumerated in the Lanham Act, but are the recoverable costs that are set forth in the Federal Judicial Code." 17 AM. JUR. 3d Proof of Facts 609 § 9 (1992) (citing 28 U.S.C. § 1920). "Such costs include fees of the clerk and marshal, fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case, fees for exemplification and copies of papers necessarily obtained for use in the case, and docket fees under Section 1923 of Title 28." *Id.* "To obtain costs, the prevailing plaintiff must file a bill of costs, which is then reviewed by the court and, upon allowance, becomes included in the judgment or decree." *Id.* Pursuant to 28 U.S.C. § 1924, "such bill of costs must be supported by the personal affidavit of one who has knowledge of the facts, stating that each 'item is correct and has been necessarily incurred in the case and that the services

for which fees have been charged were actually and necessarily performed.'" *See generally* David S. Almeling, *The Infringement-Plus-Equity Model: A Better Way to Award Monetary Relief in Trademark Cases*, 14 J. INTELL. PROP. L. 205, 209–10 (2007) (focusing on defendant's profits and plaintiff's damages "because there are separate rules and statutes that determine when and how a plaintiff can recover its costs, and because § 1117(a) expressly provides that recovery of attorneys' fees are only available in 'exceptional cases'").

Because the Lanham Act authorizes a court to order reimbursement of the prevailing party's costs under § 1117(a), the Court grants Plaintiff's request for reimbursement of all recoverable costs. *See Philip Morris USA Inc. v. Lee*, 547 F. Supp. 2d 667, 681 (W.D. Tex. 2008) ("[T]he Lanham Act authorizes a court to order reimbursement of the prevailing party's costs. . . . Accordingly, the Court grants Plaintiff's request for reimbursement of all recoverable costs.").[23]

5. Attorneys' Fees

Plaintiff requests attorneys' fees, arguing that:

> Defendants engaged in willful infringement in continuing their illegal actions after receipt of notice and the filing of this lawsuit, expanding their infringing behavior by publicly announcing the intent to open a second infringing restaurant location, failing to

[23] To be clear, costs and fees are separate, because there are separate rules and statutes that determine when and how a plaintiff can recover its *costs*, and because § 1117(a) expressly provides that recovery of *attorneys' fees* is only available in "exceptional cases."

> stand on their previous assertions of non-infringement once they faced actual consequences, and by virtue of the LLC Defendant's default.

(ECF No. 37 at 25). Plaintiff further argues "this case is also exceptional because of the Defendants' knowing and improper refusal to participate in good faith in this case." (*Id.*).

As mentioned, the court in "exceptional cases" may award reasonable attorney fees to the prevailing party. 15 U.S.C. § 1117(a). An "exceptional case" is one where "(1) in considering both governing law and the facts of the case, the case stands out from others with respect to the substantive strength of a party's litigating position; or (2) the unsuccessful party has litigated the case in an 'unreasonable manner.'" *Baker v. DeShong*, 821 F.3d 620, 625 (5th Cir. 2016) (applying *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014)). Courts have typically construed "unreasonable manner" "where an adversary engages in some form of litigation misconduct such as abusing the discovery process, filing frivolous pleadings or defenses, dishonesty, and the like." *Appliance Liquidation Outlet, L.L.C. v. Axis Supply Corp.*, 105 F.4th 362, 384 (5th Cir. 2024). Additionally, an "exceptional case" may be one in which the defendant's trademark infringement "can be characterized as 'malicious,' 'fraudulent,' 'deliberate,' or 'willful.'" *Texas Pig Stands, Inc.*, 951 F.2d at 697 (citations omitted); *see also Wearable Shoe Tree,*

*LLC v. Does 1-601*, No. 4:24-cv-334, 2025 WL 872524, at *12 (E.D. Tex. Mar. 20, 2025) (citing cases where courts found the case to be exceptional for conduct such as filing an unsupported laches defense, a counterclaim without actionable conduct, and meritless motion to dismiss; refusing to postpone depositions after the court's ruling; acting in bad faith by registering and using an infringing internet domain name to divert a competitor's potential customers; and engaging in post-trial misconduct). The mere issuance of a cease-and-desist letter does not constitute sufficient willfulness to make a case exceptional, and failing to answer does not necessarily support an "exceptional" finding. *Christus Health v. Christus Fin. Care, LLC*, No. 3:25-cv-03319, 2026 WL 1399343, at *4 (N.D. Tex. May 19, 2026); *see also Appliance Liquidation Outlet, L.L.C.*, 105 F.4th at 385 ("'An intent to confuse cannot be teased out of a business's decision to continue the challenged use after receiving a cease and desist letter,' and a defendant's 'good faith decision to stand on its view of its legal position should be no indication of evil intent or bad faith.'"). "The district court must address this issue in the case-by-case exercise of their discretion, considering the totality of the circumstances." *Baker*, 821 F.3d at 625.

Here, Defendants' conduct falls far short of the kind of culpability required to render a case "exceptional." *See Wearable Shoe Tree, LLC*, 2025 WL 872524, at *12 (finding case was not exceptional for attorney's fees where

the plaintiff's litigating position was only sufficient to find certain defaulting defendants liable for infringing "one of three" asserted trademarks, it provided nothing to support any damages for patent-infringement violations, and it failed to succeed on many of its claims despite being unopposed by the defaulting defendants); *cf. Energy Alchemy, Inc.*, 2025 WL 2625586, at *9 (finding case was exceptional where the defendants were apprised of the plaintiff's trademark rights multiple times before the lawsuit began, and they ignored three different cease-and-desist letters and continued using the "Mi Dia" mark in connection with its restaurant); *Better Keiki, LLC v. MairicoDirect*, No. 4:17-cv-00850, 2018 WL 5305571, at *6 (E.D. Tex. Aug. 29, 2018), *report and recommendation adopted sub nom. Better Keiki, LLC v. MairicoDirect, KamiroUS, DragonB Store*, No. 4:17-cv-850, 2018 WL 4520192 (E.D. Tex. Sep. 21, 2018) (finding defendants' conduct was willful for awarding attorneys' fees where the plaintiff directly informed the defendants of their infringing activity, yet the defendants continued selling their counterfeit goods, falsely reported they were the true owners of the plaintiff's marks, threatened the plaintiff's co-owner to take down his products, and sent him an email admitting they knew their actions were unlawful); *Organicare Nature's Sci., LLC*, 2025 WL 2629970, at *7 (finding case was exceptional because the defendant "entirely disregarded" the action and continued to willfully infringe

plaintiff's trade dress). In this case, there is no evidence of Defendants "palming off" Plaintiff's marks, intending to deceive or confuse customers, attempting to profit from such infringement, ignoring the litigation, or causing damage or hardship to Plaintiff's business and goodwill. *See Texas Pig Stands, Inc.,* 951 F.2d 684, 697–98 (finding case was not exceptional where there was the absence of palming off; the lack of any intent to deceive or confuse; the lack of any attempt to profit from such infringement; and the finding of a total lack of any damage or hardship to [Plaintiff's] business and good will). To the contrary, the record indicates that Defendants were unaware of Plaintiff's mark and took remedial action to resolve their alleged infringing use by rebranding. Defendants have also indicated they are amenable to stipulating to an amicable agreement regarding use of Plaintiff's marks. Clearly, Defendants have not litigated this case in an unreasonable manner. Moreover, Plaintiff's litigation position, in *partially* succeeding on a default judgment motion as to only *some* of its claims, does not show this case is exceptional. *See Christus Health*, 2026 WL 1399343, at *4 ("[N]othing about Plaintiff's litigation position shows that this [trademark] case was 'exceptional.' The case pertains to a simple default judgment that was resolved in less than one year. The Court does not find that the mere issuance of a cease-and-desist letter constitutes sufficient willfulness to make this case exceptional. As to the

second prong, the litigation conduct—failing to answer—does not support an 'exceptional' finding."). Accordingly, the Court, in its discretion, does not find this case exceptional for an award of attorneys' fees.

6. <u>Accounting of Profits and Expenses</u>

Finally, Plaintiff requests an accounting of profits and expenses under the Lanham Act. (ECF No. 37 at 26). Plaintiff contends that the "LLC Defendant has realized profits, gains, and advantages as a result of its unlawful acts . . . including its violations of the Lanham Act." (*Id.*). According to Plaintiff, "[b]ecause the LLC Defendant has not answered or otherwise participated in this lawsuit . . . Plaintiff is entitled to an accounting and disgorgement of all profits realized by the LLC Defendant as a result of its unlawful conduct." However, because Plaintiff states:

> the amount of such profits is presently unknown to Plaintiff and is within the exclusive possession and control of the LLC Defendant, Plaintiff requests that the LLC Defendant be ordered to provide a full and complete accounting of all revenues, profits, costs, and expenses associated with the LLC Defendant's 'Cowboy Chicken Peruvian' restaurants so that an appropriate award of monetary damages may be assessed.

(*Id.*).

The Court finds that an award of profits would not be equitable in this case, as the relevant factors do not weigh in Plaintiff's favor. *See Firebirds Int'l., LLC*, 397 F. Supp. 3d at 869 (considering (1) whether the defendant had

the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off) (citation omitted); *id.* ("These factors are 'non-mandatory and non-exclusive: the district court is free to consider other facts in assessing whether disgorgement of profits would be equitable, just as it may exercise discretion in weighing the individual factors.' . . . However, even if these factors favor disgorgement, a 'plaintiff is entitled to only those profits attributable to the unlawful use of its trademark.'") (citation modified). There is no indication that Defendants intended to confuse or deceive, that sales have been diverted, that there is a public interest in making Defendants' alleged misconduct unprofitable, or that this is a case of palming off. At this juncture, there is also no evidence Defendants have reaped profits attributable to the alleged unlawful use of Plaintiff's marks. For these reasons, Plaintiff's request for an accounting of profits should be denied. *See Firebirds Intl., LLC*, 397 F. Supp. 3d at 871–72 (finding that the absence of evidence of diverted sales and of profits attributable to the unlawful use of plaintiff's mark were significant considerations weighing against a disgorgement award); *Mancillas*, 2025 WL 624548, at *3 (denying an award for lost profits because the court could not be certain the defendants were liable to the plaintiff for the

alleged amount without documentary evidence to support the calculation); *cf. Choice Hotels Intl., Inc.*, 2013 WL 12125998, at *5 (awarding defendant's estimated profits in default judgment where, although no formal accounting had been made due to defendant's failure to respond, plaintiff established the amount with certainty through an affidavit detailing an analysis of actual and historical revenue data from the period of infringement).

## IV. Conclusion

Based on the foregoing, the Court **RECOMMENDS GRANTING IN PART** and **DENYING IN PART** Plaintiff's Motion for Default Judgment against the LLC Defendant. (ECF No. 37). Specifically, the Court **RECOMMENDS GRANTING** default judgment against the LLC Defendant and **GRANTING** a preliminary injunction enjoining the LLC Defendant from using Plaintiff's Cowboy Word Marks (U.S. Trademark Reg. Nos. 3,338,009 and 5,531,231) and Plaintiff's Cowboy Chicken Character Mark (U.S. Trademark Reg. No. 1,620,524).

In accordance with Federal Rule of Civil Procedure 65, the LLC Defendant is hereby immediately and preliminary enjoined from:

1. Using Plaintiff's Cowboy Word Marks (U.S. Trademark Reg. Nos. 3,338,009 and 5,531,231) and Plaintiff's Cowboy Chicken Character Mark (U.S. Trademark Reg. No. 1,620,524), whether standing alone or in any phrase, to advertise, market, promote, display, and/or offer for sale goods or services that do not in fact originate from Plaintiff.

2. Representing that any goods or services advertised, marketed, promoted, displayed, and/or offered for sale by the LLC Defendant are in any way sponsored by, approved by, affiliated with, associated with, or originated by Plaintiff.

3. Knowingly assisting, aiding, or attempting to assist or aid any other person or entity in performing any of the prohibited activities referred to above. In furtherance of this requirement, the LLC Defendant will contact all third parties that have/currently are displaying Plaintiff's Cowboy Word Marks (U.S. Trademark Reg. Nos. 3,338,009 and 5,531,231) and Plaintiff's Cowboy Chicken Character Mark (U.S. Trademark Reg. No. 1,620,524), including "Defendants' [original] Chicken Character" and "Defendants' Antara Chicken Character," to make a formal request that the third parties remove such marks. Within 30 days of the date of the Court's Order, the LLC Defendant will submit notice to this Court and to the Plaintiff attesting under Oath to full and complete compliance with the Court's Order.

4. Knowingly affecting any transactions, assignments, or transfers, or forming new entities or associations to circumvent the prohibitions referred to above.

The Court **FURTHER RECOMMENDS** permitting Plaintiff to submit a bill of costs not later than thirty (30) days after entry of judgment, if it desires to do so, in accordance with 28 U.S.C. § 1920. The Court **RECOMMENDS DENYING** Plaintiff's motion to the extent it requests a default judgment based on infringement of the Woodfire Rotisserie Chicken Marks and unjust enrichment as to all the marks, a permanent injunction, attorneys' fees, and an accounting of profits and expenses.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

**SIGNED** in Houston, Texas on October 7, 2026.

Richard W. Bennett
United States Magistrate Judge